# EXHIBIT A

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF WINCHESTER

NORTHERN VIRGINIA EYE INSTITUTE, P.C.

&

DR. TAYYIB RANA

        Plaintiffs,

v.                                    Case No.
                                       **JURY TRIAL IS DEMANDED**

CYNOSURE, LLC
a/k/a CYNOSURE, INC.
        Serve: Registered Agent
        The Corporation Trust Company
        Corporation Trust Center 1209 Orange Street
        Wilmington, DE 19801

&

HOLOGIC, INC.
        Serve: Registered Agent
        The Corporation Trust Company
        Corporation Trust Center 1209 Orange Street
        Wilmington, DE 19801

&

BROGAN BAIR
1635 Grand Meadow Drive
Gambrills, MD 21054

&

ALDO BATUBARA
2730 Arbutus Ave
Halethorpe, MD 21227

&

ROBERT DALEY
6 Fairbanks Ln

North Reading, MA 01864

    Defendants.

## COMPLAINT

COME NOW the Plaintiffs, the Northern Virginia Eye Institute, P.C. and Dr. Tayyib Rana, by their common counsel, and for their Complaint against the Defendants respectfully represent the following to the Court:

*Parties*

1. At all times relevant herein, the Plaintiff the Northern Virginia Eye Institute, P.C. (hereinafter "the Northern Virginia Eye Institute"), was a professional corporation organized under the laws of and authorized to transact business in the Commonwealth of Virginia and having a principal business office located at 212 Linden Drive, Suite 154, Winchester, Virginia 22601.

2. At all times relevant herein, the Plaintiff Dr. Tayyib Rana (hereinafter "Rana") was an individual citizen and resident of the Commonwealth of Virginia.

3. At all times relevant herein, the Defendant Cynosure, LLC (hereinafter "Cynosure") was a limited liability company organized under the laws of the state of Delaware and having a principal business office located at 5 Carlisle Road, Westford, Massachusetts 01886.

4. At all times relevant herein, the Defendant Hologic, Inc. (hereinafter "Hologic") was a stock corporation organized under the laws of the state of Delaware and having a principal business office located at 250 Campus Drive, Marlborough, Massachusetts 01752.

5. At all times relevant herein, the Defendant Brogan Bair (hereinafter "Bair") was an individual citizen and resident of the State of Maryland.

6. At all times relevant herein, the Defendant Aldo Batubara (hereinafter "Batubara") was an individual citizen and resident of the State of Maryland.

7. At all times relevant herein, the Defendant Robert Daley (hereinafter "Daley") was an individual citizen and resident of the Commonwealth of Massachusetts.

8. The several co-Defendants to this Action are hereinafter referred to collectively as "the Defendants."

*Jurisdiction and Venue*

9. This Court has jurisdiction over this Action pursuant to Va. Code § 17.1-513.

10. Venue is properly laid in this Court pursuant to Va. Code § 8.01-262(4).

*Facts Common to All Counts*

11. Rana is a board-certified ophthalmologist who has been in practice in the specialty of ophthalmology for over twenty years.

12. Rana's ophthalmology practice is operated through a Virginia-registered professional corporation, the Northern Virginia Eye Institute, of which he is the principal.

13. Rana's sole practice office is located at 212 Linden Drive, Suite 154 in the City of Winchester, Virginia.

14. Rana chiefly serves patients within the Northern Shenandoah Valley and the geographic area of his practice comprises the cities of Winchester, Virginia and Martinsburg, West Virginia and the counties of Frederick, Clarke, Warren and Shenandoah, Virginia and Berkeley County, West Virginia.

15. As used herein, the term "Northern Shenandoah Valley" shall refer to the aforesaid cities and counties.

16. Cynosure is a Westford, Massachusetts-based manufacturer of "energy-based" devices—machines which utilize heat, lasers, radiofrequency waves and other forms of energy to affect human tissues for medical, therapeutic and aesthetic ends.

17. Hologic, a Massachusetts-based medical technology company, was at all times relevant herein the corporate owner, parent and/or affiliate of Cynosure[1] and is the probable successor-in-interest to those certain contracts entered into between Cynosure and the Northern Virginia Eye Institute and/or Rana mentioned *infra*.

18. On or about January 29, 2019, a Cynosure sales representative, Batubara, made an unsolicited sales visit to Rana at his Winchester office.

19. On such visit, Batubara was principally promoting Cynosure's TempSure RF platform (hereinafter, variously, "the TempSure" or "the TempSure platform"), a family of devices which generate and direct radiofrequency waves for therapeutic and cosmetic ends.

20. In response to the information respecting the TempSure platform provided by Batubara, Rana expressed interest in the platform's potential to treat keratoconjunctivitis sicca— more commonly known as "dry eye"—a condition common to many of his patients.

---

[1] Cynosure was acquired from Hologic by an affiliate of the private equity firm Clayton, Dubilier & Rice in late 2019.

Page **3** of **13**

21. Batubara also represented to Rana that Cynosure was seeking less of a "purchaser" for its TempSure platform and more of a "partner:" an ophthalmologist with whom the company would work hand-in-hand to promote the TempSure platform and demonstrate its medical and cosmetic uses to both potential patients and the medical community at large.

22. Batubara represented to Rana that as a benefit of the "partnership" contemplated by the company, Rana would be provided with a "customized marking program" by Cynosure, which would include search-engine optimization, social media outreach and advertising.

23. Rana, however, raised concerns to Batubara about the TempSure platform being sold to other physicians within the Northern Shenandoah Valley.

24. Rana explained to Batubara that because the Northern Shenandoah Valley is a comparatively small and low income market, the potential patient base for the TempSure platform—and especially for cosmetic applications of the platform—was limited.

25. Rana further explained to Batubara that if multiple physicians were offering the TempSure platform in the Northern Shenandoah Valley, the market would quickly become oversaturated, thereby resulting in too many physicians competing over a too-small base of patients.

26. In response to Rana's concerns about market oversaturation, Batubara represented that as an incident of Rana's purchase of the TempSure platform, Cynosure would grant him "geographic exclusivity" with respect to ophthalmology: the company would not sell the TempSure platform to another ophthalmologist with an office within forty radial miles of Rana's Winchester office.

27. As used hereinafter, the term "Geographic Exclusivity" shall refer to Cynosure forbearing sales of a TempSure platform to another ophthalmologist with an office located within forty radial miles of Rana's Winchester office.

28. On or about January 30, 2019, Rana met with another Cynosure representative, Bair, who represented to Rana that she held the title of Cynosure's district sales manager for the Washington, D.C. area.

29. As Batubara did, Bair touted the "partnership" that Cynosure wished to form with Rana.

30. However, as he did to Batubara, Rana expressed his concerns to Bair regarding market oversaturation if more than one physician was offering the TempSure platform in the Northern Shenandoah Valley.

31. In response to Rana's concerns, Bair told Rana that "no one else had the [TempSure platform] in the [Northern Shenandoah Valley] area."

32. In further response to Ran's concerns, Bair reiterated and reaffirmed the promise of Geographic Exclusivity made by Batubara: if Rana purchased a TempSure, Cynosure would not sell the TempSure platform to another ophthalmologist with an office within forty radial miles of Rana's Winchester office.

33. Rana, however, had misgivings about the $100,000 price for the TempSure platform quoted to him by Bair and refused to commit to its purchase during their meeting.

34. Bair then arranged a meeting between Rana and her ostensible superior, Daley, who held the title of Cynosure's director of east coast sales.

35. Rana and Daley met in person in Loudoun County, Virginia on February 11, 2019.

36. During such meeting, Daley reiterated that Cynosure desired to "partner" with him; in Daley's telling, Rana would act as a "brand ambassador" for the company within the field ophthalmology, speaking on the company's behalf at industry conferences and generally "opening doors" within the field.

37. Rana, however, expressed concern to Daley about the $100,000 purchase price quoted to him by Bair, as well as the TempSure platform's lack of an "imaging device," which several competing devices featured.

38. *Inter alia,* while using an energy device like the TempSure platform to treat the gland responsible for "dry eye"—the Meibomian gland, colloquially known as the tear duct—the gland must be "imaged" to ensure that the treatments are efficacious.

39. In response to the concerns expressed by Rana, Daley offered to discount the price of the TempSure to $80,000—in consideration of their future "partnership"—if Rana paid $20,000 toward the purchase price via check that night; Daley also offered to provide Rana with $10,000 to be used towards the purchase of a secondary imaging device for the TempSure platform.

40. When Rana requested a day or two to consider the offer, Daley told Rana that he needed a decision on the spot; otherwise, he told Rana, he would abandon the sale and sell the TempSure to other interested physicians within the Northern Shenandoah Valley.

41. Rana was struck by how the situation resembled more the process of buying a cheap used car or a mattress and less a highly complex medical device with a price running into the hundreds of thousands of dollars.

42. Ultimately, in reliance on Batubara's and Bair's promise of Geographic Exclusivity and with the expectation that he would be granted the same if he purchased the TempSure, Rana accepted Daley's offer with a handshake.

43. Daley then presented Rana with a one page, pro-forma contract which was captioned "Customer Purchase Agreement" (hereinafter "the Contract").

44. Rana executed the Contract on behalf of the Northern Virginia Eye Institute and Daley did likewise on behalf of Cynosure. A copy of the Contract is attached hereto as Exhibit A.

45. After signing the Contract, Rana queried Daley about how the balance of the TempSure's purchase price was to be paid; Daley blithely replied that "we'd figure something out."

46. The Contract provided that "[Rana] accepts all of the terms and conditions as stated in this document (including the following page(s)). This Agreement is subject to Cynosure's terms and conditions of sale contained or referred to herein[.]"

47. However, no additional terms and conditions of sale were appended to the Contract; separately furnished by Cynosure to Rana contemporaneous with his execution of the Contract or at a later date; incorporated by specific reference to an external website; or otherwise incorporated by explicit or implicit reference.

48. Rather, the Contract, which comprised one page and contained virtually no substantive terms or provisions, was the only instrument entered into by Rana/the Northern Virginia Eye Institute and Cynosure to memorialize his purchase of the $80,000 TempSure platform.

49. Rana took delivery of the TempSure platform on or about February 21, 2019, but it sat unopened in his office for several more weeks before a Cynosure representative arrived to begin the process of training Rana and his staff members on its use.

50. Before he began using the TempSure platform on his patients, Rana was shocked to come across an advertisement in local media by another Winchester-based opthamologist, Dr. Alla Hynes ("Hynes"), advertising TempSure treatments.

51. Hynes is a fellow-board certified ophthalmologist and colleague of Rana's whose practice, Eye Care Physicians and Surgeons, is located mere minutes from Rana's Winchester office.

52. Upon seeing the advertisement, Rana immediately contacted Hynes, who disclosed that she too had entered into a contract with Cynosure on or about January 19, 2019 for the purchase of a TempSure platform and a certain other Cynosure laser device.

53. Hynes further told Rana that she had expressed the same concerns that he had about market oversaturation to the Cynosure representatives with whom she had dealt and that in response, she had been promised the same Geographic Exclusivity which Rana had been promised.

54. In specific, Hynes told Rana that she had been assured by two separate Cynosure sales representatives, Bair and a Mr. Scott Hill (hereinafter "Hill") that if Hynes purchased a TempSure platform, the company would not sell a TempSure platform or any other Cynosure devices to another ophthalmologist with an office located within forty radial miles of Hynes' Frederick County office.

55. Given that Bair had sold a TempSure platform to Hynes less than two weeks before her January 30th meeting with Rana, Bair's representation to Rana that "no other physician in the [Northern Shenandoah Valley] area had the TempSure" was a knowing and bald falsehood.

56. During their March, 2019 conversation, Hynes and Rana came to the same realization: Cynosure had sold the same device to two ophthalmologists whose practices were within miles of one another despite explicitly promising Geographic Exclusivity to both.

57. Hynes and Rana also concluded that they had both they had been deceived, swindled and defrauded by Cynosure and the company representatives with whom they dealt.

58. Soon after his conversation with Hynes, Rana contacted Bair via text message regarding the matter.

59. Bair responded that she would "look into this asap" and, in response to Rana's bewilderment that Hynes had been sold a TempSure platform, Bair replied that Hynes' TempSure was located in Woodstock, Virginia.

60. The implication of Bair's statement was clear: that because Hynes' TempSure was ostensibly located in Woodstock, the sale to Rana, whose office was in Winchester, did not violate the company's grant of Geographic Exclusivity to both them.

61. In response to Bair's assertion that Hynes' TempSure system was in Woodstock, Rana explained to her that Hynes was in fact using her TempSure at her Frederick County office, which was mere miles from his Winchester office.

62. Moreover, given that Bair had brokered the sale of Hynes' Cynosure devices to her at her Frederick County office and understood that Hynes would be using such devices there, Bair's excuse about Hynes' TempSure being located in Woodstock was likely another knowing and bald falsehood.

63. Rana further explained to Bair that irrespective of whether Hynes' device was in Frederick County or Woodstock, both cities were well within forty radial miles of his office, thereby violating her and Batubara's promise that he would be granted Geographic Exclusivity as an incident of his purchase of the TempSure.

Page 7 of 13

64. Bair then began a pattern of deliberately evasive and avoidant conduct, failing to keep several appointments to meet with Rana and becoming nearly-wholly unresponsive to his repeated attempts to contact her.

65. Rana was finally able to contact another Cynosure representative via telephone, a Mr. Michael Russo (hereinafter "Russo"), who represented to Rana that he held the title of Cynosure's post-sales national manager.

66. During such call, Rana explained to Russo that he and Hynes, two ophthalmologists with practices within miles of one another, had both been sold TempSure platforms notwithstanding Cynosure's promise that each doctor would have Geographic Exclusivity in the Northern Shenandoah Valley.

67. In response, Russo brusquely replied to Rana that Cynosure "would never promise exclusivity" and "would never offer any sort of mileage restrictions on the sale or use of the device."

68. When Rana inquired as to what else he could do about the matter, Russo sniffed that he could try to contact Bair again.

69. Rana's telephone conversation with Russo was the last communication he had with any Cynosure representative.

70. As of the date of this Complaint, Bair has not responded to any of the multiple attempts by Rana to contact her.

71. As of the date of this Complaint, Rana's TempSure platform remains unused and sits in a corner of his office, little more than a very expensive paperweight.

72. As a result of the deceit, fraud, unfair dealing and bad faith of Cynosure and its representatives, Rana and the Northern Virginia Eye Institute have suffered substantial damages.

73. At all times relevant herein, Bair, Hill, Batubara, Daley and Russo were employees and/or agents of Cynosure and/or Hologic and were acting within the scope of their employment and/or agency therewith.

74. At all times relevant herein, Bair, Hill, Batubara, Daley and/or Russo had actual and/or apparent authority to act on behalf of Cynosure and/or Hologic as alleged herein, including without limitation actual and/or apparent authority to make the representations to Rana respecting the grant of Geographic Exclusivity alleged herein.

### COUNT I – ACTUAL FRAUD (as against all Defendants)

75. Rana and the Northern Virginia Eye Institute hereby incorporate and reallege paragraphs 1 through 74 as if fully set forth herein.

76. Bair, Batubara and/or Daley, and/or Cynosure and/or Hologic, through the actions and omissions of its employees and/or agents Bair, Batubara and/or Daley, made false representations and/or omissions of material facts to Rana, including without limitation as follows:

   i. on or about January 29, 2019, Batubara falsely represented to Rana that if he purchased a TempSure platform, Rana and/or the Northern Virginia Eye Institute would be granted Geographic Exclusivity;

   ii. on or about January 30, 2019, Bair falsely represented to Rana that if he purchased a TempSure platform, Rana and/or the Northern Virginia Eye Institute would be granted Geographic Exclusivity;

   iii. on or about January 30, 2019, Bair falsely represented to Rana that no other physician in the Northern Shenandoah Valley had the TempSure platform;

   iv. on or about February 11, 2019, Daley failed to disclose to Rana, who had been told otherwise by Batubara and Bair, that he would not receive Geographic Exclusivity as an incident of his purchase of the TempSure platform.

77. Batubara, Bair and/or Daley made their respective aforesaid false representations and/or omissions to Rana intentionally, deliberately and with knowledge of their falsity, *viz.*, Batubara, Bair and/or Daley knew that:

   i. as of the date of Batubara's and/or Bair's respective representations regarding the grant of Geographic Exclusivity to Rana, a TempSure system had already been sold to another ophthalmologist, Hynes, within the Northern Shenandoah Valley, thereby rendering Geographic Exclusivity an *ex ante* impossibility;

   ii. Cynosure would not grant, either formally or informally, Geographic Exclusivity to Rana/the Northern Virginia Eye Institute;

   iii. Cynosure would not otherwise honor, in any way, Batubara's and/or Bair's promises of Geographic Exclusivity to Rana;

   iv. Cynosure actively pursue and consummate sales of the TempSure platform to ophthalmologists with offices located within forty radial miles of Rana's Winchester office notwithstanding Batubara's and/or Bair's promises of Geographic Exclusivity.

78. In point of fact, Bair had personally brokered the sale of a TempSure platform to another Winchester area ophthalmologist—Hynes—less than two weeks prior to the date on which she made the aforesaid false representations to Rana.

79. Batubara, Bair and/or Daley made their respective false representations and/or omissions to Rana with the intention to deceive him and Rana relied on their representations and/or omissions inasmuch as he would not have entered into the Contract on behalf of the Northern Virginia Eye Institute and would not have otherwise purchased the TempSure platform absent Batubara's, Bair's and/or Daley's false representations and/or omissions.

80. Because Batubara, Bair and/or Daley made their respective false representations and/or omissions to Rana while they were acting within the scope of their employment and/or agency with Cynosure and/or Hologic, and because Batubara, Bair and/or Daley had actual or apparent authority to make such representations and/or omissions, Cynosure and/or Hologic are liable therefor.

81. Rana and/or the Northern Virginia Eye Institute suffered significant damages on account of Rana's reliance on Batubara's, Bair's and/or Daley's false representations and/or omissions.

WHEREFORE, the Plaintiffs, Northern Virginia Eye Institute, P.C. and Dr. Tayyib Rana respectfully request: (1) an award of compensatory damages, to be proved at trial; (2) an award of punitive damages, not to exceed $350,000; (3) an award of attorney's fees and costs; (4) rescission of the Contract and return of monies paid; and (5) such other and further relief as the nature of this case and the ends of justice may require.

## COUNT II – CONSTRUCTIVE FRAUD (as against all Defendants; in the Alternative to Count I)

82. Rana and the Northern Virginia Eye Institute hereby incorporate and reallege paragraphs 1 through 69 as if fully set forth herein.

83. Bair, Batubara and/or Daley, and/or Cynosure and/or Hologic, through the actions and omissions of its employees and/or agents Bair, Batubara and/or Daley, made false representations and/or omissions of material facts to Rana, including without limitation as follows:

   i. on or about January 29, 2019, Batubara falsely represented to Rana that if he purchased a TempSure platform, Rana and/or the Northern Virginia Eye Institute would be granted Geographic Exclusivity;

   ii. on or about January 30, 2019, Bair falsely represented to Rana that if he purchased a TempSure platform, Rana and/or the Northern Virginia Eye Institute would be granted Geographic Exclusivity;

   iii. on or about January 30, 2019, Bair falsely represented to Rana that no other physician in the Northern Shenandoah Valley had the TempSure platform;

  iv. on or about February 11, 2019, Daley failed to disclose to Rana, who had been told otherwise by Batubara and Bair, that he would not receive Geographic Exclusivity as an incident of his purchase of the TempSure platform.

84. Batubara, Bair and/or Daley made their respective aforesaid false representations and/or omissions innocently and/or negligently.

85. Rana relied on Batubara's, Bair's and/or Daley's innocent and/or negligent false representations and/or omissions inasmuch as he would not have entered into the Contract on behalf of the Northern Virginia Eye Institute and would not have otherwise purchased the TempSure platform absent Batubara's, Bair's and/or Daley's false representations and/or omissions.

86. Because Batubara, Bair and/or Daley made their respective false representations and/or omissions to Rana while they were acting within the scope of their employment and/or agency with Cynosure and/or Hologic, and because Batubara, Bair and/or Daley had actual or apparent authority to make such representations and/or omissions, Cynosure and/or Hologic are liable therefor.

87. Rana and/or the Northern Virginia Eye Institute suffered significant damages on account of Rana's reliance on Batubara's, Bair's and/or Daley's false representations and/or omissions.

WHEREFORE, the Plaintiffs, Northern Virginia Eye Institute, P.C. and Dr. Tayyib Rana respectfully request: (1) an award of compensatory damages, to be proved at trial; (2) an award of punitive damages, not to exceed $350,000; (3) an award of attorney's fees and costs; (4) rescission of the Contract and return of monies paid; and (5) such other and further relief as the nature of this case and the ends of justice may require.

### COUNT III – BREACH OF CONTRACT (as against the corporate Defendants only; in the Alternative to Counts I & II)

88. Rana and the Northern Virginia Eye Institute hereby incorporate and reallege paragraphs 1 through 69 as if fully set forth herein.

89. Bair and/or Batubara, and Cynosure and/or Hologic, through Bair and/or Batubara, made promises, guarantees, assurances and/or offers to Rana which became material terms of Rana's and/or the Northern Virginia Eye Institute's contract with Cynosure and/or Hologic upon Rana's acceptance thereof, *viz.*,

  i. if Rana/the Northern Virginia Eye Institute purchased a TempSure platform, he and/or the Northern Virginia Eye Institute would be granted Geographic Exclusivity.

90. Cynosure and/or Hologic materially breached its contract with Rana/the Northern Virginia Eye Institute by selling a TempSure platform to Hynes, an ophthalmologist whose office was located well within forty radial miles of Rana's Winchester office.

91. Rana and/or the Northern Virginia Eye Institute suffered damages on account of Cynosure's and/or Hologic's material breach of its contract with Rana/the Northern Virginia Eye Institute.

WHEREFORE, the Plaintiffs, Northern Virginia Eye Institute, P.C. and Dr. Tayyib Rana respectfully request: (1) an award of compensatory damages, to be proved at trial; (2) an award of attorney's fees and costs; (3) rescission of the Contract and return of monies paid; and (4) such other and further relief as the nature of this case and the ends of justice may require.

Respectfully Submitted,
NORTHERN VIRGINIA EYE
INSTITUTE, P.C. & DR. TAYYIB RANA

By Counsel
Marilyn Ann Solomon, Esq.
VSB#31501
Andrew J. Muzic, Esq.
VSB#82458
Solomon Law Group
130 East Cork Street
Winchester, VA 22601
(540) 678-0569
(540) 678-0697 (fax)
msolomon@solomonlaw.biz

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of January, 2021 a true and correct copy of the foregoing Complaint was mailed first class, postage prepaid, to the following:

CYNOSURE, LLC
a/k/a CYNOSURE, INC.
c/o Registered Agent
The Corporation Trust Company

Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801

HOLOGIC, INC.
c/o Registered Agent
The Corporation Trust Company
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801

BROGAN BAIR
1635 Grand Meadow Drive
Gambrills, MD 21054

ALDO BATUBARA
2730 Arbutus Ave
Halethorpe, MD 21227

ROBERT DALEY
6 Fairbanks Ln
North Reading, MA 01864

Marilyn Ann Solomon, Esq.
Counsel for Plaintiff

# CYNOSURE

5 Carlisle Road, Westford, MA 01886
Telephone: 978-256-4200   Fax: 978-349-7443

**Customer Purchase Agreement**          Date:

## CUSTOMER INFORMATION

Customer Name: Northern Virginia Eye Institute
Contact Person: Dr. Taribi Raos
Address: 218 Linden Drive, Suite 154
City/State/Zip: Blacksburg, VA 22601
Telephone/Fax: 540-313-4435

Ultimate Ship To:
Telephone/Fax:

| PRODUCT DESCRIPTION | QTY | Unit Price (in USD) | Total Price (in USD) |
|---|---|---|---|
| 1. TempSure® RF Generator with:<br>A. TempSure Envi face, body & surgical application that includes:<br>• On-site installation & clinical in-service, and one (1) year equipment warranty<br>• Single Pedal Footswitch and Power Cord<br>• Surgical 2-pedal Footswitch and power cord<br>• Cart<br>• 5 Treatment Handpieces (10mm, 15mm, 20mm, 25mm, 30mm) - 25hr life each handpiece<br>• 2 Massage Heads (25mm & 3-mm), and Handpiece Adapter<br>• 1 box (6 containers) treatment gel (8 oz/container)<br>• 9 Boxes of disposable IEC-NPD Neutral Pads (25/box)<br>• 1 Piece of IEC-NPC reusable neutral plate<br>• 1 Box of DSEP40 assorted disposable electrodes (40/box)<br>• 1 Box of A8D VanTip™ Wire electrodes (25/box)<br>• 1 Box of B1D 1/4" Round Loop electrodes (25/box)<br>• 1 Box of B2D 3/8" Round Loop electrodes (25/box)<br>• 1 Box of 133D Pin electrodes (25/box)<br>• 1 Box of D8D Ball electrodes (25/box)<br>• 5 Boxes of IEC-3FHPB-D disposable 3-button fingerswitch handpieces (10/box)<br>• 1 Piece of IEC-3FHPB reusable 3-button fingerswitch handpiece<br>• 1 Piece of IEC-HP1 reusable foot-controlled handpiece<br>• 2 Boxes TEE305 Empire Needle (2/box)<br>• 1 Piece of J1 bipolar forceps<br>• 1 Piece of H79 handpiece clip<br>• 6 Pieces IEC-BC Bipolar Cable<br>• 23-240BE Corneal Shield<br>• 1 Cosmetic Treatment Package IEC-H135A (50 Micro-insulated Needles, 1 Surgical Handpiece, 50 Surgical Brochures)<br>• TempSure Envi Practice Marketing Kit : Printed marketing material support including: patient pamphlets, AMPS post-sale marketing support materials, treatment pads.<br>• Freight | 1 | $130,000 | $130,000 |
| Buffalo Filter® Smoke Evacuation Package<br>• ViroVac™ 100/120V Portable Smoke Evacuator | 1. | | |

- Include 10k marketing Rebate
  ★ Approved by Bob Daley ★

★ Approved by Bob Daley ★

$80,000
~~$130,000~~

Quoted Price Valid for 30 days from above date. Prices do not include sales, duty or excise taxes, including medical device taxes which are the responsibility of the Customer to pay and will be billed separately.

## ACCEPTANCE OF AGREEMENT

By signing below, the Customer (i) is representing to Cynosure, Inc. ("Cynosure") that it has the requisite corporate authority to execute and deliver this Customer Purchase Agreement ("Agreement") and has the required licensing from the applicable state medical review board to operate the Product purchased by this Agreement, and (ii) is entering into a binding agreement for the purchase of the Product and/or services described above and accepts all of the terms and conditions as stated in this document (including the following page(s)). This Agreement is subject to Cynosure's terms and conditions of sale contained or referred to herein and the Customer expressly disclaims any additional and/or different terms and conditions of any terms and conditions on the Customer's purchase order. Federal law restricts the sale of the products to a licensed practitioner.

_Signature_  2-11-19       _Signature_  2-11-19
Customer Signature (Authorized Representative)   Date       Cynosure Area Sales Manager Signature   Date

Delivery Date: 2-21-19

934-5M03-004, Rev. E

**EXHIBIT A**